## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| TODD A. MOATS, | ) | CASE NO. 3:20-cv-00265 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Todd A. Moats (Plaintiff" or "Moats") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

Moats filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in June 2017.  Tr. 21, 228-237.  Moats alleged disability beginning on June 16, 2017, (Tr. 21, 226, 271, 272), due to neuropathy, diabetes, fatigue, and learning disability.  Tr. 160, 275.  After initial denial by the state agency (Tr. 160-165) and denial upon reconsideration (Tr. 168-172), Moats requested a hearing (Tr. 173-174)  On October 4, 2018, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 41-95.  Moats was not represented at the hearing, declined the opportunity to continue the hearing in order to obtain representation, and signed a written waiver of right to representation.  Tr. 45-46, 222.

On February 20, 2019, the ALJ issued a decision unfavorable to Moats (Tr. 18-40), finding that he had not been under a disability within the meaning of the Social Security Act from June 16, 2017, through the date of the decision (Tr. 22, 35).  Moats requested review of the ALJ's decision by the Appeals Council.  Tr. 224-225.  On December 11, 2019, the Appeals Council denied Moats' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Moats was born 1980.  Tr. 52, 228.  He was 38 years old at the time of the hearing.  Tr. 52.  Moats was married.  Tr. 53.  His wife worked full-time.  Tr. 53.  They lived in a two-story home with no basement.  Tr. 51-52.  Moats graduated from high school.  Tr. 54.  While in school he was in learning disability classes and had an Individualized Education Plan in high school. Tr. 54, 351, 375-391.  Moats' past work included work as a fork-lift operator; stores laborer; motorcycle assembler; and machine operator; and cleaner.  Tr. 55-58, 83-84.  Moats' most recent job was as a fork-lift operator at Campbell Soup Company.  Tr. 55.

### B.    Medical evidence

#### 1.  Treatment history

Moats saw Lindsay Hartman, CNP, at Defiance Community Health Center on May 19, 2016, to establish care.  Tr. 403-404.  Moats' complaints included his diabetes mellitus, fatigue, and excessive urination.  Tr. 403.  Moats also reported that his feet were hurting, he had been a little cranky, he had neuropathy and chest pain that had subsided about a month prior to his visit. Tr. 403, 404.  Moats was not following a diabetic diet and was not checking his blood glucose at home.  Tr. 443.  He checked his blood glucose at his mother's house with her meter.  Tr. 403,

404.  Nurse Hartman noted that Moats' smoking and obesity were risk factors for complications.

Tr. 403.  Nurse Hartman discussed smoking cessation with Moats and the importance of a well-

balanced diet and exercise.  Tr. 403.

Moats continued to see Nurse Hartman for follow-up during 2016.  Tr. 409-413, 414-418,

419-423, 424-428, 429-433.  During a June 2, 2016, visit, Nurse Hartman noted that Moats'

diabetes was uncontrolled.  Tr. 409.  Nurse Hartman recommended diabetic shoes to help with

his neuropathy pain but due to lack of insurance Moats was not certain that he could afford them.

Tr. 412.  During a June 27, 2016, visit, Moats' diabetes remained uncontrolled.  Tr. 414.  Moats

complained that his feet sweated horribly and made it difficult to wear shoes.  Tr. 414.  Nurse

Hartman recommended that Moats change his socks frequently, try different socks, look into

getting diabetic shoes, and try over-the-counter prescription strength deodorant on his feet.  Tr.

414.

During a July 2016 visit, Moats' diabetes had improved since his prior visit.  Tr. 419.  He

still had neuropathy.  Tr. 419.  Moats was starting a new job and planned to look into diabetic

shoes.  Tr. 419.  Nurse Hartman made adjustments to Moats' neuropathy medication.  Tr. 422.

During a November 2016 follow-up visit with Nurse Hartman, Moats complained that his

right foot pain was worse when he wore shoes.  Tr. 429.  Moats reported that his neuropathy was

still bad.  Tr. 430.  He was wearing his inserts but relayed that his foot pain was bilateral, with

the pain worse in his right foot than the left.  Tr. 430.  Nurse Hartman discussed the possibility of

an EMG and x-rays of Moats' feet but, before proceeding, Moats needed to look into how to pay

for the testing.  Tr. 433.

Moats saw Nurse Hartman on March 9, 2017, for follow up.  Tr. 434.  Nurse Hartman

noted that Moats' diabetes was controlled.  Tr. 435.  He continued to report neuropathy.  Tr. 435.

Moats relayed he had been laid off and with not working he was doing well with the neuropathy. Tr. 435.  Moats planned to look into obtaining insurance to proceed with testing before returning to work.  Tr. 435.

On May 23, 2017, Moats saw Prasad Policherla, M.D., a neurologist at Mercy Defiance Clinic.[1]  Tr. 394-399, 400.  Moats reported paraesthesias in both feet.  Tr. 395, 397, 398. Physical examination findings were normal and a neurological examination showed that Moats was able to follow three-step commands without any difficulty; his speech and language function were normal; his insight, judgment, fund of knowledge, recent and remote memory, and attention and concentration were within normal limits.  Tr. 397.  Moats' sensory examination was within normal limits, with the exception of Moats' subjective report of paraesthesias in both feet.  Tr. 397.  Moats' reflexes, coordination, station and gait were normal.  Tr. 398.  Dr. Policherla listed the following active problems/diagnoses – Type II diabetes mellitus; non-morbid obesity; smoking; numbness and tingling in both legs below the knees; peripheral neuropathy; mixed hyperlipidemia; and sleep difficulties.  Tr. 398.

During a June 15, 2017, follow-up visit with Nurse Hartman, Moats relayed that the pain in his feet was getting worse.  Tr. 441.  His employer wanted him to return to work but Moats did not feel that he could because of the pain.  Tr. 441.  Moats was considering filing for disability because he was struggling to go back to work due to the pain.  Tr. 441.  He needed a doctor's note to have a sit down job because at work he drove a tow motor but he was sometimes required to work on a line and it caused intense pain making it very difficult for him to stand.  Tr. Tr. 441.  Moats also relayed he had a slight learning disability so there were many jobs such as bank teller that he could not perform because he was unable to process information fast enough.

---

[1] The treatment records also reflect that Tara Grimes, LPN, participated in the May 23, 2017, visit.  Tr. 399.

Tr. 441.  On physical examination, Nurse Hartman observed that Moats was able to stand without difficulty and his gait was normal.  Tr. 441.  Nurse Hartman advised Moats to return if his symptoms worsened or persisted.  Tr. 445.  Otherwise, she advised Moats to return for a follow-up visit in three months.  Tr. 445.

On September 21, 2017, Moats saw Warren Morris, M.D., at Defiance Community Health Center, complaining that his feet were sweating more than usual.  Tr. 453.  Moats relayed that he had to quit his job because of his diabetic neuropathy.  Tr. 453.  Dr. Morris examined Moats and refilled his prescriptions.  Tr. 454-456.  He recommended that Moats try to quit smoking.  Tr. 454.

Moats saw Nurse Hartman on December 21, 2017, for a three-month diabetes follow up. Tr. 512-517.  Nurse Hartman noted that Moats' diabetes was uncontrolled.  Tr. 512.  Moats reported that his blood sugars had worsened since his last visit.  Tr. 513.  He continued to complain of neuropathy.  Tr. 513.  Nurse Hartman and Moats discussed the possibility of a neuropsych evaluation.  Tr. 513.

During a March 21, 2018, visit with Nurse Hartman, Moats' diabetes remained uncontrolled.  Tr. 527.  He was continuing to have neuropathy.  Tr. 528.  He had not made dietary changes and was not exercising.  Tr. 528.  Moats saw Nurse Hartman on April 25, 2018, for a one-month diabetic follow-up appointment.  Tr. 532.  He continued to report neuropathy. Tr. 533.  Moats was working with a job coach but they had been unable to find a job for Moats that he could perform without shoes.  Tr. 533.  Moats was continuing to struggle with excessive feet sweating.  Tr. 533.

When Moats saw Nurse Hartman on June 7, 2018, for follow up he was not checking his blood glucose at home and was continuing to have neuropathy.  Tr. 538. However, he reported

he was getting more exercise and making better dietary choices.  Tr. 538.  He was scheduled to
see Dr. Rohdy on June 19 but was not scheduled to see endocrinology for six months.  Tr. 538.
Moats reported that he was starting to struggle with numbness and tingling of his right thigh ever
since having an EMG.  Tr. 538.

On June 19, 2018, Moats saw podiatrist Jonathan D. Rohdy, DPM, for his bilateral foot
pain and bilateral hyperhidrosis in his feet.  Tr. 484-491.  Following his examination, Dr. Rohdy
recommended that Moats start Lyrica for his neuropathic pain and stop Neurontin.  Tr. 491. Dr.
Rohdy also recommended that Moats try formaldehyde for the excessive sweating.  Tr. 491.  Dr.
Rohdy indicated that, if those interventions did not help, Moats should see a dermatologist and
possibly an endocrinologist in the future.  Tr. 491; *see also* Tr. 565.

On August 6, 2018, Moats saw Krishna Mutgi, M.D., a dermatologist for his sweaty feet.
Tr. 584-592.  Dr. Mutgi discussed various treatment options for treating the excessive sweating
but explained that, while the treatment might improve the sweating, it may not improve his pain.
Tr. 591.  Dr. Mutgi provided Moats with a prescription for a Drionic machine and recommended
that he continue to see his primary care physician for his neuropathy.  Tr. 558, 592.

Moats saw Nurse Hartman for follow up on September 6, 2018.  Tr. 547-551.  Moats
relayed that he had seen a podiatrist and a dermatologist.  Tr. 548.  Moats relayed he was
interested in getting a machine to help control his sweat glands.  Tr. 548.  Moats was applying
for disability.  Tr. 548.

## 2.     Opinion evidence

### *Consultative psychological evaluation*

On August 16, 2017, psychologist Ryan R. Wagner, Psy.D., conducted a consultative
psychological evaluation.  Tr. 446-452.  Dr. Wagner conducted a clinical interview of Moats and

reviewed background materials provided by the Ohio Division of Disability Determination for the evaluation. Tr. 446. Also, the Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV) was administered. Tr. 446. Moats' scores on the WAIS-IV were as follows: Verbal Comprehension Index – 68; Perceptual Reasoning Index – 75; Working Memory – 69; Processing Speed Index – 74; and Full-Scale IQ – 66. Tr. 449. Dr. Wagner indicated that Moats' Full-Scale IQ score fell within the mildly deficient range. Tr. 449. Dr. Wagner observed that Moats appeared to put forth adequate effort on testing. Tr. 449.

Based on his evaluation, Dr. Wagner diagnosed Moats with adjustment disorder with depressed mood and mild intellectual disability. Tr. 450. Dr. Wagner offered his opinion regarding Moats' functional abilities. Tr. 450-452.

With respect to Moats' abilities and limitations in understanding, carrying out, and remembering instructions, both one step and complex, Dr. Wagner noted that Moats "was able to converse effectively to complete the evaluation" and that Moats "reported problems learning work related tasks[.]" Tr. 451. Dr. Wagner opined that Moats' WAIS-IV test scores suggested that Moats would have problems understanding directions and difficulty remembering instructions. Tr. 450-451. Dr. Wagner also stated that Moats "reported problems with learning in school which may lead to difficulties acquiring new information in work settings[.]" Tr. 451.

With respect to Moats' abilities and limitations in sustaining concentration and persistence in work-related activity at a reasonable pace, Dr. Wagner noted that Moats "displayed adequate task persistence when answering questions"; he "displayed some indications of distraction during the evaluation"; and he "reported problems with attention and concentration in school[.]" Tr. 451. Dr. Wagner opined that Moats' struggles with completing serial sevens but his ability to complete serial threes suggested that Moats would have some difficultly

maintaining attention and focus.  Tr. 451.  Dr. Wagner also stated that Moats "described a history of problems with attention and concentration within work environments which may affect his ability to complete tasks in a timely and effective manner."  Tr. 451.

With respect to Moats' abilities and limitations in maintaining effective social interaction on a consistent and independent basis, with supervisors, coworkers, and the public, Dr. Wagner noted that Moats was cooperative and pleasant during the evaluation; Moats had no close friends or family except for his wife; and Moats presented with below average cognitive ability.  Tr. 451.  Dr. Wagner stated that Moats "described a history of conflicts with people in work settings which may lead to conflicts in future work settings when presented with work related stressors" and Moats "described potential impacts of mental health problems on work performance which may lead to emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate coworker relationships."  Tr. 451.

With respect to Moats' abilities and limitations in dealing with normal pressures in a competitive work setting, Dr. Wagner noted that Moats had a euthymic affect but Moats "described considerable frustration when discussing past and current pressures[.]"  Tr. 451.  Dr. Wagner indicated that Moats "did not describe anxious symptoms that would compromise his ability to respond to work pressures[.]"  Tr. 451.  Dr. Wagner stated that Moats "described depressive symptoms that may compromise his ability to respond to work pressures and lead to increased emotional instability and withdrawal" and Moats "endorsed a history of emotional deterioration in work settings which led to him having an attitude with his boss[.]"  Tr. 451-452.  Dr. Wagner opined that Moats "presented with below average cognitive ability to adapt to work pressures which may lead to difficulty managing work expectations and pace[.]"  Tr. 452.

8

*Neuropsychological evaluation*

Upon the referral of Nurse Hartman, on October 12, 2017, Joan A. Lawrence, Ph.D., at Community Hospitals and Wellness Centers completed an outpatient neuropsychological evaluation.  Tr. 463-477.  Dr. Lawrence noted that Moats was referred for a "baseline neuropsychological evaluation to quantify general cognitive skills."  Tr. 464.  Various tests were administered, including the WAIS-IV.  Tr. 465-466.  Moats' scores on the WAIS-IV were as follows: Verbal Comprehension Index – 72; Perceptual Reasoning Index – 81; Working Memory – 66; Processing Speed Index – 81; and Full-Scale IQ – 71.  Tr. 467, 472.  Dr. Lawrence's impression included her findings that:

> The present evaluation reflected a neurocognitive profile that was generally below normal limits, albeit with some isolated areas of low normal to normal performance in nonverbal tasks consistent with wife's report of relatively better skills in hands-on tasks.  Compromise on the order of at least mildly to moderate impairment was evident in fine motor speed and dexterity bilaterally, all aspects of auditory attention and complex visual attention, and problems with multitasking, simultaneous attention, and alternating attention, which collectively undermine his ability to effectively and efficiently engage in higher order cognitive functions. Mr. Moats also showed frank impairments in intellectual functioning, verbal and nonverbal reasoning, auditory memory storage, visual memory at the levels of storage, retention, and retrieval, and executive skills involving organizing and processing voluminous amounts of information, multitasking/organizing/planning in general, and effectively and efficiently using executive hypothesis generation and testing skills to solve problems and make decisions with complex/abstract/novel concepts and strategies.

Tr. 469-470.  Dr. Lawrence found that Moats' "histories, presentation, and current levels and patterns of neurocognitive performance are most consistent with . . . diagnoses of . . . Mild Intellectual Disability, and . . . Unspecified Depressive Disorder."  Tr. 470.

*State agency psychological medical consultants*

Initial review

On initial review, state agency psychological medical consultant Jennifer Swain, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 102-103) and Mental RFC Assessment (Tr. 106-108). In rendering her opinions, Dr. Swain considered the opinion of consultative examiner Dr. Wagner. Tr. 104, 109. In the PRT, Dr. Swain opined that Moats was moderately limited in his ability to understand, remember or apply for information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. 102.

In the Mental RFC Assessment, with respect to understanding and memory limitations, Dr. Swain opined that Moats was moderately limited in his ability to understand and remember detailed instructions, noting Full-Scale IQ score of 66 consistent with his work history; history of special education; and "somewhat concrete thought content at [consultative examination] and noticeable for confusion." Tr. 106-107. However, she opined that Moats was capable of understanding and remembering simple, repetitive tasks. Tr. 107.

With respect to sustained concentration and persistence limitations, Dr. Swain opined that Moats was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; make simple work-related decision; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 107. Dr. Swain explained the limitations, stating "[a]djustment [disorder] and mild intellectual disability; noted for some confusion at the [consultative examination], appeared to give up easily at times on tasks that were difficult[.]" Tr. 107. Dr. Swain opined that Moats remained capable

10

of performing simple, repetitive tasks in an environment without strict time demands or high production quotas.  Tr. 107.

With respect to social limitations, Dr. Swain opined that Moats was moderately limited in his ability to interact appropriately with the general public and in his ability to accept instructions and respond appropriately to criticism from supervisors.  Tr. 107-108.  Dr. Swain further explained that Moats was capable of occasional, superficial interaction with the general public; he had no limitations in interacting with coworkers; and feedback from supervisors should be simple and constructive.  Tr. 108.

With respect to adaptation limitations, Dr. Swain opined that Moats was moderately limited in his ability to respond to changes in the work setting.  Tr. 108.  Dr. Swain further explained that Moats could work in a static environment where non-routine changes are known ahead of time and implemented slowly.  Tr. 108.

Reconsideration review

Upon reconsideration, state agency psychological medical consultant Irma Johnston, Psy.D., completed a PRT (Tr. 133-134) and Mental RFC Assessment (Tr. 138-140).  Dr. Johnston opinion affirmed the findings of Dr. Swain.

**C.    Hearing testimony**

**1.    Plaintiff's testimony**

As indicated above, Moats was not represented at the hearing and declined the ALJ's offer to postpone the hearing to allow Moats to obtain representation.  Tr. 45-46.  The ALJ inquired about the records already in the file and also asked Moats whether there were outstanding records.  Tr. 46-49.  Moats indicated he provided some additional records that day and noted that he saw an endocrinologist; had an e-psych evaluation done in Montpelier, he saw

a Dr. Rohdy; he saw doctors in Defiance, Ohio; and saw a doctor by the name of Krishna.  Tr. 47-49.  The ALJ noted that records from the Ohioans with Disabilities had been ordered.  Tr. 48.  The ALJ explained to Moats that he should provide any records he had and if there were duplicates, they would not be exhibited.  Tr. 48-49.

Moats relayed that he currently weighed about 250 pounds and was 5'6" tall.  Tr. 52.  He had lost a lot of weight the year before when he became diabetic but he had gained the weight back.  Tr. 52.  Moats had a license and was able to drive.  Tr. 53-54.  Moats drove himself to the hearing, which took about 45 minutes.  Tr. 54.  Moats' wife accompanied him to the hearing.  Tr. 54.  Moats explained he had been in learning disability classes throughout school.  Tr. 54.  He relayed that he had problems with reading and spelling big words but he was able to read the newspaper "somewhat" and he could perform basic math, i.e., addition and subtraction.  Tr. 54-55.

Moats last worked at Campbell Soup Company but stopped working because of problems with his feet.  Tr. 58.  He explained that he can no longer wear shoes because of neuropathy and excessive sweating in his feet.  Tr. 58-59.  He wears flip flops except when he has to go out in the winter.  Tr. 59.  During winter, he puts on socks and shoes to get to the car but then usually takes them off.  Tr. 59, 65.  For example, if he has a doctor's appointment, once he gets to the doctor's office, he takes his shoes off.  Tr. 59.  Moats had been having the problem with his feet for the prior year and a half to two years.  Tr. 59.  He has tried diabetic shoes and creams but they did not help.  Tr. 59-60.  Moats' doctor had recently recommended a Drionic device[2] to help with the sweating.  Tr. 60-61.  Moats had started using the device about three weeks before the

---

[2] "The Drionic® Wireless Devices are the first ever pulsed current personal care device that stops sweating on the hands and feet." https://drionic.com/drionic-hand-foot-pair-of-devices/ (last visited 1/8/2021).

12

hearing, every morning for 30 minutes.  Tr. 61.  Moats had not yet seen any positive results.  Tr. 61.  However, his doctor indicated that it would take about a month to see results.  Tr. 61.  Moats explained that the flip flops allow him to kick his foot up so that air can go underneath and dry the bottom of his feet off.  Tr. 60, 64.  Moats estimated being able to wear shoes with socks for about 10 minutes before it becomes uncomfortable.  Tr. 65.  Moats takes Gabapentin and it helps with the burning sensation in his feet but not with the sweating.  Tr. 65-66.  Once his feet start to sweat, the burning sensation returns.  Tr. 65-66.

Moats went to Ohioans with Disabilities, a place that helps individuals find jobs.  Tr. 63. According to Moats, they told him that they could not find any jobs for him.  Tr. 63-64.  They dismissed his case because they could not find any jobs where Moats could not wear shoes.  Tr. 63-64.

Moats leaves his house about once a week; usually to go to a store.  Tr. 66.  When Moats does go to the store, he wears his flip flops and uses a motorized cart because he cannot walk for that long.  Tr. 66.  Moats' father visits him on occasion but Moats does not travel to see family. Tr. 67, 70.  Moats can perform chores outside and inside the home.  Tr. 62-63, 67.  For example, he can mow the lawn using a riding mower.  Tr. 62-63.  It usually takes him about an hour and a half.  Tr. 63.  He can take the trash out, get the mail, sweep, vacuum, and clean.  Tr. 67, 70. Moats and his wife usually stay at home.  Tr. 67.  However, they had recently joined a gym.  Tr. 68.  Moats' doctor had recommended that Moats stay active and recommended that Moats take up swimming which he had done.  Tr. 68-70.  Moats relayed that the swimming was going well. Tr. 69.

Moats and his wife do not really go out to eat because they do not have the money to do so.  Tr. 70.  When his wife is at work, Moats usually watches television.  Tr. 67.  He has lost

13

interest in hobbies because of the issues with his feet and his inability to really do things anymore.  Tr. 67.  He used to enjoy riding his motorcycle but he does not feel comfortable riding with flip flops so he does not ride anymore.  Tr. 67-68.  He tried riding once with sandals but it did not work out.  Tr. 68.

### 2. Mindy Moats' testimony

Moats' wife, Mindy Moats ("Mindy"), testified at the hearing.  Tr. 71-82, 88-91, 92-95.  Mindy explained that it was her understanding that Moats was unable to work because he could not wear shoes for a long period of time and she also indicated he had "some mental disabilities that stop him from gaining new information to get a new career."  Tr. 71-72.  Mindy relayed that her husband usually wore flip flops unless it was really snowy.  Tr. 72.  When that occurs, Moats wears his shoes to the car and then takes them off when they get to where they are going.  Tr. 72.  Mindy indicated that Moats had a new machine, a Drionic Device, that he was trying.  Tr. 72-73-75.  She explained that she understood that the device was supposed to send electric currents to his feet and clog his sweat glands.  Tr. 72, 73-75.  Moats had been using the machine daily for 30 minutes but, as of the time of the hearing, it had not helped with the sweating in Moats' feet.  Tr. 72.  Mindy explained that the device had been prescribed by Moats' dermatologist Krishna Mutgi.  Tr. 75.

Mindy indicated that they did not have regular visitors.  Tr. 77.  Due to a lack of money, the Moats did not really do much as far as entertainment.  Tr. 77.  They usually just watched movies at home.  Tr. 77.

Mindy explained that the Ohioans with Disabilities were unable to find jobs for Moats.  Tr. 78.  Mindy indicated that they had told her husband that they could not help him find a job unless he could wear shoes.  Tr. 78.  It was the Ohioans with Disabilities who sent Moats to a

podiatrist since Moats had not been to see one before.  Tr. 78.  The podiatrist prescribed some medicine.  Tr. 78.  If the medicine did not work, the podiatrist recommended that Moats see a dermatologist.  Tr. 78-80.  Moats ultimately saw a dermatologist and it was the dermatologist that prescribed the Drionic Device.  Tr. 80.  The dermatologist had indicated that surgery was a possibility to address the sweating but the dermatologist did not recommend it because it could cause sweating elsewhere and it might not fix the problem.  Tr. 79-80, 81.

Mindy felt that the Gabapentin and Lyrica helped the neuropathy for a short amount of time but nothing helps the sweating.  Tr. 81.  Mindy can tell that the sweating has started if Moats has his socks and shoes on because he gets very agitated and has to take them off.  Tr. 82. Mindy relayed that Moats has described the sweating "like if you would just put your shoes and socks on and walk through a mud puddle and then just walk in your shoes and socks all day long and slipping and sliding and then causing severe pain."  Tr. 82.

At the conclusion of the hearing, the ALJ asked Moats and his wife some additional questions regarding the doctors that Moats and seen and the records, including questions about the endocrinologist.  Tr. 88-91.  With respect to the endocrinologist, Mindy relayed that there was no visit with an endocrinologist because the Ohioans for Disabilities indicated that an endocrinologist would not be helpful to Moats.  Tr. 79, 90.  They explained to Moats that an endocrinologist would be beneficial for diagnosing diabetes and assessing an individual's needs but since Moats already had neuropathy it really could not be reversed.  Tr. 79.

Mindy also explained that anything else that the ALJ would need would be at Defiance Mercy Hospital because there were a couple of records that they did not have with them because Moats had just seen them.  Tr. 91.  Mindy indicated there was the neurological evaluation from Montpelier Hospital from Joan Lawrence which had been provided to the ALJ.  Tr. 91, 93-94.

15

Moats confirmed that the ALJ had a copy of the evaluation. Tr. 91. Mindy asked the ALJ whether he had been able to read through the neurological evaluation because Mindy felt that there were things in that evaluation that addressed things that her husband could and could not do. Tr. 93-94. For example, she pointed out that there was discussion as to what Moats could do as far as attention and concentration. Tr. 94. The ALJ indicated that he had the evaluation and had reviewed it and would review it again when the remainder of the records came in. Tr. 94.

### 3. Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 82-88. The VE summarized Moats' past work as including forklift operator, store laborer, motorcycle assembler, machine operator, and cleaner. Tr. 83-84.

The ALJ asked the VE to assume an individual with Moats' age, education and work experience with the RFC to perform medium work and occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never push or pull with the bilateral lower extremities; frequently balance, stoop, kneel, crouch, and crawl; avoid all exposure to hazards; can understand, remember and carry out simple instructions; can perform simple routine and repetitive tasks but not at a production rate pace such as assembly line; can adapt to routine changes in the workplace that are infrequent and easily explained; and can interact occasionally with supervisors, coworkers, and the general public. Tr. 84-85. The VE indicated that the described individual could perform Moats' past work as a store laborer and cleaner. Tr. 85. The VE also indicated that there would be a limited range of medium, unskilled work that the described individual could perform including kitchen helper, salvage laborer, and dipper. Tr. 85-86. The VE provided national job incidence data for the identified jobs. Tr. 85-86. The ALJ asked the VE whether the described individual would be able to perform the jobs if he was

16

unable to wear closed-toe shoes for a normal workday.  Tr. 86.  The VE responded that with that additional limitation, the individual would not be able to perform the jobs identified.  Tr. 86.

The ALJ asked if there would be jobs available to the individual described in the prior hypothetical, including the limitation of not being able to wear closed-toe shoes, if the exertional level was be sedentary rather than medium.  Tr. 86.  The VE indicated that there would be jobs available for that individual, including general office clerk, addresser, and surveillance monitor.  Tr. 86.  The VE provided national job incidence data for the identified jobs.  Tr. 86.

The VE explained that, if an individual was absent two days per month, that would be excessive, and the individual would not be able to perform the identified jobs.  Tr. 86-87.  If an individual was off task more than 15 percent of the workday that would also be excessive, and the individual would not be able to sustain work.  Tr. 87.

The ALJ asked the VE to explain the basis of his conclusion that the hypothetical individual would be able to perform the identified sedentary jobs without needing closed-toe shoes.  Tr. 87.  The VE indicated that it was based on his experience regarding clerical jobs, explaining that, while you do not see it in the male population, you frequently see females wear open-toed shoes in a clerical office type setting.  Tr. 87-88.  The VE also indicated that his responses as to absenteeism, being off task, and breaks was not addressed in the DOT (Dictionary of Occupational Titles) but his responses were based on his experience and education.  Tr. 88.  Otherwise, the VE indicated that his testimony was consistent with the DOT and SCO (Selected Characteristics of Occupations).  Tr. 88.

At the conclusion of the VE's testimony, the ALJ explained to Moats that Moats had the right to ask the VE questions and, if he had questions, the ALJ could assist Moats with phrasing the questions.  Tr. 88.  Moats indicated that he did not have any question.  Tr. 88.

17

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his February 20, 2019, decision, the ALJ made the following findings:[4]

1.     Moats meets the insured status requirements of the Social Security Act
       through December 31, 2020.  Tr. 24.

2.     Moats has not engaged in substantial gainful activity since June 16, 2017,
       the alleged onset date.  Tr. 24.

3.     Moats has the following severe impairments: diabetes mellitus with
       peripheral neuropathy, hyperhidrosis of bilateral feet, obesity, adjustment
       disorder with depressed mood, and mild intellectual disability.  Tr. 24.

4.     Moats does not have an impairment or combination of impairments that
       meets or medically equals the severity of the listed impairments.  Tr. 24-
       28.

5.     Moats has the RFC to perform a range of sedentary exertional work as
       defined in 20 C.F.R. § 404.1567(a), subject to the following – he can
       occasionally climb ramps and stairs, but never ladders, ropes or scaffolds;
       he can never push or pull with the bilateral lower extremities; he can
       frequently balance, stoop, kneel, crouch and crawl; he must avoid all
       exposure to hazards; he can understand, remember and carry out simple
       instructions; he can perform simple, routine, and repetitive tasks but not at
       a production rate pace such as an assembly line; he can adapt to routine

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances,
citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations
found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,
corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. §
416.920).

[4] The ALJ's findings are summarized.

changes in the workplace that are infrequent and easily explained; he can interact occasionally with supervisors, coworkers, and the general public; and he cannot wear closed-toe shoes.  Tr. 28-33.

6.    Moats is unable to perform any past relevant work.  Tr. 33.

7.    Moats was born in 1980 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 33.

8.    Moats has at least a high school education and is able to communicate in English.  Tr. 34.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 34.

10.   Considering Moats' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Moats can perform, including general office clerk, addresser, and surveillance monitor.  Tr. 34-35.

Based on the foregoing, the ALJ determined that Moats had not been under a disability, as defined in the Social Security Act, from June 16, 2017, through the date of the decision.  Tr. 35.

## V. Plaintiff's Arguments

Plaintiff presents three arguments in his appeal.  His first and third arguments are related. In his first argument, Plaintiff, who was unrepresented at the hearing, contends that the ALJ erred in his duty to develop the record.  Doc. 13, pp. 9-12.  In his third argument, Plaintiff contends that the ALJ failed to sufficiently cross-examine the VE.  Doc. 13, pp. 17-18.  In his second argument, Plaintiff argues that the ALJ did not build a logical bridge between the evidence: namely, the opinion of the consultative examiner Dr. Wagner and the RFC and ALJ's decision that Plaintiff did not have a listing level impairment.  Doc. 13, pp. 12-16.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The undersigned recommends that the Court find that the ALJ did not fail to develop the record or ensure that Moats had a full and fair hearing**

Moats' first and third arguments are related and are therefore considered together.  In making both arguments, Plaintiff points out that he was unrepresented at the administrative hearing and contends that the ALJ was under a greater duty to develop the record.  In his first argument, Plaintiff contends that the ALJ erred in his duty to develop the record by not obtaining all relevant records.  Doc. 13, pp. 9-12.  In this third argument, Plaintiff contends that the ALJ failed to sufficiently cross-examine the VE.  Doc. 13, pp. 17-18.

An ALJ has an obligation to ensure "that every claimant receives a full and fair hearing . . . [but] the administrative law judge must not become a partisan and assume the role of counsel." *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).  An ALJ has a special, heightened duty to develop the record under special circumstances, such as "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures[.]" *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-1052).   However, "the mere fact that a claimant was unrepresented is not grounds for reversal." *Duncan v. Sec'y of Health & Human Servcs.*, 801 F.2d 847, 856 (6th Cir. 1986).  And, "[t]here is no bright line test for determining when the administrative law judge has assumed the role of counsel or failed to fully develop the record." *Lashley*, 708 F.2d at 1052.  A court must make the determination on a case-by-case basis.  *Id.*

Moats contends that the ALJ failed in his duty to develop the record because the ALJ did not make any effort to obtain records from the endocrinologist or the e-psych evaluation.  Doc. 13, pp. 11-12.  Moats also argues that the ALJ erred in his duty to fully develop the record

because he did not inquire into the VE's methodology or market surveys used to provide his opinions regarding job availability.  Doc. 13, pp. 17-18.

Even considering Moats' unrepresented status, a review of the record demonstrates that the ALJ did not err in his duty to develop the record.   Before proceeding with the hearing, the ALJ explained to Moats his right to have representation at the hearing either by an attorney or non-attorney.  Tr. 45.  The ALJ explained that representatives cannot charge a fee unless the claimant is found to be disabled.  Tr. 45.  The ALJ explained that, if a claimant is found disabled, the representative's fee request is subject to approval by an ALJ, noting however, that if a claimant appoints a representative there may be some expenses such as copying charges that the claimant is responsible for.  Tr. 45.  The ALJ also explained that there were also some legal organizations that provide representative free of charge.  Tr. 45.  The ALJ asked Moats whether he had been provided a list with the names of those organization and Moats indicated that he believed he had been provided with such a list.  Tr. 45.  A "report of contact" record reflects that, during a pre-hearing development communication between the SSA and Moats, contact information for representatives/representative organizations was provided to Moats.  Tr. 219.

The ALJ explained to Moats that he did have the right to proceed without a representative and if he chose to do that the ALJ would obtain the relevant medical records and question Moats at the hearing.  Tr. 45-46.  However, the ALJ further explained that a representative could present Moats' case in a manner that was most favorable to Moats.  Tr. 46.

Following the foregoing discussion, the ALJ asked Moats if he understood his right to a representative and Moats indicated he did.  Tr. 46.  The ALJ explained that he would grant Moats a postponement of the hearing if he wanted to obtain counsel.  Tr. 46.  Moats replied, "I don't today . . . [n]eed a lawyer, I'm doing this myself."  Tr. 46.  The ALJ confirmed by stating

"Okay.  You want to go ahead on your own?" and Moats responded "Yeah."  Tr. 46.  The ALJ explained that there was a form that Moats would need to sign acknowledging he wanted to proceed without a representative (Tr. 46) and Moats signed the form (Tr. 222).

The ALJ then proceeded to ask Moats if he had a chance to review the file and Moats indicated that he had.  Tr. 46.  Moats had copies of additional records that he provided at the hearing.  Tr. 47.  Moats indicated he had been to an endocrinologist and he had an e-psych evaluation conducted but, when recalling the various doctors he had been to, he noted "my wife is better at this than I am."  Tr. 47.  Moats indicated that the ALJ did not have the e-psych evaluation.  Tr. 47.  The ALJ followed up, stating "Well, I did see one.  Hang on a sec.  Well, we - - was it done in Montpelier?" and Moats replied, "Yes. Correct."  Tr. 47.  And, the ALJ stated "We have that."  Tr. 47.  Moats responded, "[o]kay[]" and proceeded to explain that there were records from Defiance, Ohio.  Tr. 47.  The ALJ asked Moats if he could provide a little more information regarding those records.  Tr. 47.  Moats indicated one was an endocrinologist and he started looking for a paper but stated he "[a]lways got it mixed up."  Tr. 47.  The ALJ stopped Moats so the ALJ could take a look at what records had been ordered.  Tr. 48.  The ALJ noted that they had ordered records from Ohioans with Disabilities and then asked Moats if there were any other records that they did not have.  Tr. 48.  Moats asked if they had a record from August 6 from a doctor by the name of Krishna at Mercy in Defiance.  Tr. 48.  The ALJ indicated he did not think that they had that record.  Tr. 48.  Moats had a record with him from Mercy in Defiance and the ALJ instructed Moats to provide the records and the ALJ would take a look and, if there were duplicates, would not exhibit them.  Tr. 48-49.

During the VE's testimony, the ALJ asked the VE to advise if his opinions conflicted with the DOT and to inform them of the basis for his opinions.  Tr. 83.  The VE confirmed that

he would do so. Tr. 83. When the VE provided testimony regarding the ability to perform jobs if the individual was unable to wear closed-toe shoes, the ALJ questioned the VE as to the basis for his opinion. Tr. 87. The VE acknowledged that the DOT and SCO did not address that limitation but he explained that his opinion was based on his experience. Tr. 87-88. The ALJ also asked the VE whether his testimony was consistent with the DOT and SCO. Tr. 88. The VE testified that there were no inconsistencies, however, he explained that the DOT does not address certain issues, e.g., closed-toes shoes, absenteeism, off task time, or breaks, but the VE confirmed that he was relying on his experience and education with respect to those matters. Tr. 88. After the ALJ questioned the VE, the ALJ explained to Moats, "[Y]ou do have the right to ask [the VE] any questions. They kind of have to be phrased in a certain way and I can help you with that, if you have questions. Is there anything that you would like to ask him?" Tr. 88. Moats indicated that he did not have any questions. Tr. 88.

After the VE testified, the ALJ asked Moats and Moats' wife questions about the outstanding records. Tr. 88. The ALJ asked for the name of Moats' dermatologist and, in response, Moats' wife indicated the records from the dermatologist, who Moats had only seen once, had been provided. Tr. 88-90. The ALJ also asked about the endocrinologist visits. Tr. 90. Mindy explained that there was no endocrinologist visit because they were informed that seeing an endocrinologist would not be helpful to Moats. Tr. 90. The ALJ noted that they were waiting for the notes from the Ohio Division of Disabilities. Tr. 90. The ALJ asked if there was anything else and Mindy indicated that anything else that the ALJ would not have would be from the Defiance Mercy Hospital. Tr. 90-91. Mindy also referenced the neurological evaluation from Montpelier Hospital but noted that had already been provided. Tr. 91. Moats acknowledged this as well, noting "Yeah . . . He's got a copy." Tr. 91.

25

The ALJ explained that he planned to hold the record open to review the records that Moats had submitted and to receive the other information that had been ordered.  Tr. 91-92.  The ALJ reminded Moats that, if there was any additional information of which Moats was aware, whether it helped or hurt his case, Moats had to provide it to the ALJ.  Tr. 92.

Following that exchange, Mindy brought up the neurological evaluation, noting that the VE had provided testimony regarding ability to perform office work and the evaluation provided information regarding what Moats could and could not do.  Tr. 92-93.  Mindy asked the ALJ whether he had read through the evaluation or only just received it.  Tr. 93.  The ALJ indicated he wanted to make sure that they were talking about the same evaluation.  Tr. 93-94.  The ALJ confirmed that the evaluation to which Mindy was referring was the evaluation from Montpelier Hospital/Joan Lawrence.  Tr. 94.  The ALJ indicated he had seen the evaluation and would review it again when everything else came in but asked whether there was anything that the Moats wanted brought to his attention regarding it.  Tr. 93-94.  Mindy indicated that there was detail in the evaluation regarding Moats' attention and concentration and things he could and could not do.  Tr. 94.  The ALJ again relayed that he had looked at the evaluation.  Tr.  94.

After the hearing, on November 1, 2018, the ALJ obtained additional records and sent a letter to Moats informing him of additional information that he intended to enter into the record, i.e., records from Mercy Health, Krishna Mutgi, M.D., and Ohioans with Disabilities.  Tr. 339.  Moats was offered the opportunity to provide written comments or statements regarding the new evidence and he was offered the opportunity to submit additional records but did not do so.  Tr. 21, 339.

Initially, the undersigned concludes that Moats has not established that, because Moats was unrepresented, the ALJ had a heightened duty to develop the record.  As explained above, an

ALJ has a special, heightened duty to develop the record under special circumstances, such as "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures[.]" *Wilson*, 280 Fed. Appx. at 459. Here, the record reflects that Moats was fully aware of his right to proceed with representation and was even provided an opportunity to postpone the hearing to obtain counsel. Having been provided with information regarding his right to representation, Moats made the decision to proceed without representation. Furthermore, "the mere fact that a claimant was unrepresented is not grounds for reversal." *Duncan*, 801 F.2d at 856. Additionally, the record does not reflect that Moats was incapable of presenting an effective case or that he was unfamiliar with the hearing procedures. Considering the foregoing, the undersigned concludes that the ALJ did not have a special, heightened duty to develop the record in this case.

Furthermore, whether or not the ALJ's duty in this case was heightened, the undersigned finds that Moats has not shown that the ALJ failed in his duty to develop the record. Moats contends that the ALJ failed to satisfy his duty to develop the record because he did not obtain Moats' endocrinology records or an e-psych evaluation.

At the start of the hearing, when the ALJ inquired whether there were any additional records, Moats noted he treated with an endocrinologist and he brought copies of records with him. Tr. 47. Throughout the course of the hearing, it was made clear, however, that Moats had not seen an endocrinologist. Tr. 79, 90. Moreover, during the administrative hearing, it was made clear that the "e-psych" evaluation mentioned by Moats was conducted in Montpelier by Joan Lawrence. Tr. 47, 48, 93-94. The neuropsychological evaluation conducted by Joan Lawrence is in the record (Tr. 458-477, Exhibit 6F) and was considered by the ALJ (Tr. 25, 26, 30-31, 33). In his reply brief, Moats argues that the outpatient neuropsychological examination

conducted by Joan Lawrence is not the same thing as an "e-psych" evaluation and reversal or remand is warranted since there is no e-psych evaluation in the file. Doc. 17. However, notwithstanding this assertion by Moats, he has not submitted or produced a copy of the purported e-psych evaluation that he asserts the ALJ failed to obtain. Nor has he submitted the endocrinology records that he contends the ALJ erred in failing to obtain. Furthermore, as discussed above, when the ALJ described to Moats the additional information that he had obtained, which included records from Mercy Health, Krishna Mutgi, M.D., and Ohioans with Disabilities, Moats was offered the opportunity to submit additional records. Tr. 339. Thus, had Moats believed that there were still records outstanding, he had the opportunity to submit them but did not do so. Tr. 21.

Considering the foregoing, the undersigned finds that the ALJ did not err in developing the record with respect to the purported endocrinology records or e-psych evaluation. Furthermore, the undersigned finds that the ALJ did not fail to develop the record by not cross-examining the VE on behalf of Moats regarding the VE's methodology or surveys used with respect to his opinion regarding job availability. Here, the ALJ provided Moats the opportunity to pose questions to the VE and offered to assist Moats in phrasing questions that he might have. Tr. 88. Moats declined to ask any questions or ask the VE to assist him in phrasing questions. Tr. 88. Furthermore, Moats fails to provide controlling legal authority to support his position that the ALJ was obligated to cross-examine the VE on behalf of Moats. The Supreme Court case Moats cites in connection with his argument regarding the VE testimony, i.e., *Biestek v. Berryhill*, provides that a VE's refusal, upon the request of a claimant, to provide survey data underlying his opinion regarding job availability does not automatically prevent the VE's testimony from serving as substantial evidence. 139 S.Ct. 1148, 1154-1157 (2019). Rather,

whether the VE's testimony can serve as substantial evidence is determined on a case-by-case basis. *Id.* at 1157. Thus, not only has Moats failed to provide controlling legal authority to support his claim that the ALJ was obligated to cross-examine the VE on Moats' behalf, even if Moats, or the ALJ, on behalf of Moats, had requested that the VE provide underlying data to support his opinion regarding the availability of jobs, the VE's refusal to provide such data would not necessarily preclude the ALJ from relying on the VE's testimony. Moats' reliance upon two cases from the Seventh Circuit does not persuade the undersigned that the ALJ erred by not cross-examining the VE regarding data to support his opinions. The ALJ questioned the VE regarding the bases of his opinions. *See e.g.*, Tr. 88. Moats has not shown that more extensive examination or cross-examination was required by the ALJ in order to fulfill his duty to develop the record or to provide Moats with a full and fair hearing.

For the reasons explained above, the undersigned finds that the ALJ was not under a heightened duty to develop the record. Furthermore, the undersigned finds that the ALJ did not fail to develop the record nor did the ALJ fail to ensure that Moats received a full and fair hearing.

**C.      The undersigned recommends that the Court find that the ALJ properly weighed the opinion of Dr. Wagner, the consultative psychological examiner, and the decision is supported by substantial evidence**

Plaintiff contends that the ALJ improperly discounted the opinion of Dr. Wagner and the ALJ's decision is not supported by substantial evidence because the ALJ did not build a logical bridge between the evidence and the ALJ's decision and RFC finding. Doc. 13, pp. 12-16.

Since Moats' claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See*

29

*Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations set forth the various categories of evidence, which include (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)-(5).

The new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2). Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence

30

and supporting explanations presented by a medical source are to support his or her medical

opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions

or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  And the

"consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior

administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

The regulations provide that administrative law judges "may, but are not required to,

explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as

appropriate, when [they] articulate how [they] consider medical opinions and prior

administrative medical findings in [a claimant's] case record."[5]  20 C.F.R. § 404.152c(b)(2).

Here, consistent with the regulations, the ALJ considered and explained his reasons for

finding the opinion of Dr. Wagner unpersuasive, stating:

> In regard to the claimant's mental impairments, the psychological  consultative
> examiner, Ryan Wagner, Psy.D., indicated that the claimant described depressive
> symptoms that may compromise his ability to respond to work pressures and lead
> to increased emotional instability and withdrawal (Ex. 4F/6). The claimant reported
> problems with learning in school, which may lead to difficulties acquiring new
> information in work settings (Id.). The claimant reported problems learning work
> related tasks (Id.). The claimant described a history of problems with attention and
> concentration within work environments, which may affect his ability to complete
> tasks in a timely and effective manner (Id.). The claimant described potential
> impacts of mental health problems on work performance, which may lead to
> emotional instability when presented with critical supervisory feedback and
> difficulty developing and maintaining appropriate co- worker relationships (Id.).
>
> The undersigned finds Dr. Wagner's opinion unpersuasive, as it appears to be based
> entirely upon the claimant's subjective complaints, as opposed to objective medical

---

[5] However, where administrative law judges find that there are equally persuasive medical opinions or prior
administrative medical findings about the same issue but where they are not exactly the same, administrative law
judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of
this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or
decision."  20 C.F.R. § 404.1520c(b)(3).

> evidence. On that point, it is inconsistent with the claimant's lack of mental health treatment and lacks support from the results of the psychological consultative examination, which reflects some limitations based upon the claimant's Full IQ score, but also shows that the claimant maintains the ability to perform simple tasks based upon his performance on the mental status examination and his description of his activities of daily living (Ex. 4F/2-6).

Tr. 32.  The ALJ's explanation for finding Dr. Wagner's opinion unpersuasive is clearly articulated, finding it not entirely supported by objective evidence and based on subjective statements and also not consistent with other evidence in the record, including the lack of mental health treatment.  Tr. 32.  Moats does not contend that he had a history of mental health treatment.  He only argues that "if psychological treatment were really so important to prove up Moats's condition, then the ALJ should have made sure the ePsych report was in the record." Doc. 13, p. 13.  However, as discussed above, the ALJ did not err in his duty to develop the record.  Thus, Moats' attempt to rely on this argument to demonstrate that the ALJ erred when considering Dr. Wagner's opinion fails.

Additionally, the ALJ did not disregard the IQ test scores.  Rather, he noted that the Full-Scale IQ score "reflects some limitations[,]" but also found that the results of the evaluation also showed that Moats had "the ability to perform simple tasks based upon his performance on the mental status examination and his description of his activities of daily living[.]"  Tr. 32.  The ALJ also discussed the IQ score in connection with this Step Three analysis.  Tr. 25-27.

Contrary to Moats' suggestion, the ALJ did not ignore evidence.  Moreover, while Moats challenges the ALJ's decision to discount Dr. Wagner's opinion in part because the ALJ found it based on Moats' reported subjective statements, as discussed above, that was not the sole reason that the ALJ found the opinion unpersuasive.  Furthermore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

Also, while Moats points to other evidence to argue that more weight should have been provided to Dr. Wagner's opinion or that the ALJ should have found that Moats had a more restrictive RFC, there is substantial evidence to support the ALJ's decision regarding Moats' mental limitations.  For example, the ALJ considered other opinion evidence in rendering his decision, including the opinions of the state agency consultants, who reviewed and considered Dr. Wagner's opinion (*see e.g.*, Tr. 107), explaining:

> The record also includes the opinions of two state agency psychological consultants,  Jennifer Swain, Psy.D., and Irma Johnston, Psy.D. (Ex. lA/11-13; Ex. 5A/9-11). According to Dr. Swain, the claimant is capable of understanding and remembering simple, repetitive tasks (Id.). The claimant is capable of performing simple, repetitive tasks in an environment that does not require strict time demands or high production quotas (Id.). The claimant is capable of occasional, superficial interaction with the general public (Id.). The claimant has no limitations on interaction with coworkers, but supervisory feedback should be simple and constructive (Id.). The claimant is capable of working in a relatively static environment where any non-routine change is known beforehand and is implemented slowly (Id.). On reconsideration, Dr. Johnston adopted the opinion of Dr. Swain in its entirety (Id.).
>
> The undersigned finds the opinions of Dr. Swain and Dr. Johnston persuasive, as they are supported by the results of the psychological consultative examination and neuropsychological examination, and consistent with the claimant's activities of daily living and limited mental health treatment (Ex. 4F/2-4; Ex. 6F/13-14).

Tr. 31-32.  The ALJ properly relied on the opinions of the state agency medical consultants in assessing the RFC and their opinions constitute substantial evidence to support the ALJ's decision.   Since there is substantial evidence to support the ALJ's decision, even if Moats could demonstrate evidence to support a more restrictive RFC, the Court cannot overturn the Commissioner's decision. *See  Jones*, 336 F.3d at 477.

Moreover, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a

33

physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).

In a cursory fashion, Moats suggests that the listing analysis was insufficient. Doc. 13, p. 15. However, the ALJ's listing analysis is thorough and well explained. Tr. 24-25 (explaining why Listing 12.04 and 12.05 were not met). Other than pointing out his Full-Scale IQ score, which the ALJ considered, Moats fails to explain what listing Moats' impairments meet or equal; he fails to show how his impairments meet or equal a listing; and he fails to show error in the ALJ's consideration of the evidence at Step Three. Considering the foregoing, the undersigned finds that Moats has failed to demonstrate that reversal or remand is warranted based on the ALJ's Step Three analysis and/or Moats has waived the argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

For the reasons discussed herein, the undersigned finds that the ALJ properly considered and explained the reasons for finding Dr. Wagner's unpersuasive.  Furthermore, the undersigned finds that the ALJ's decision is supported by substantial evidence and reversal and remand is not warranted.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

January 8, 2021                                  */s/ Kathleen B. Burke*
                                                        Kathleen B. Burke
                                                        United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).